[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 652 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 653 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 654 
Thomas Douglas Arthur was indicted and tried for the capital murder of Troy Wicker, whom he shot once with a pistol through the right eye. Mr. Arthur, the appellant herein, was indicted, pursuant to § 13A-5-40 (a)(13), Code of Alabama 1975, for "murder by a defendant who has been convicted of any other murder in the 20 years preceeding the crime."
The jury returned a verdict of "guilty as charged in the indictment," and, after a separate sentencing-phase hearing, fixed appellant's punishment at death. The trial court, after its separate sentencing-phase hearing and in accordance with the jury's verdict, sentenced the appellant to death by electrocution.
Eddie Lang was employed as a patrol officer with the Muscle Shoals Police Department on February 1, 1982. He testified that on that morning he was working with the early morning school traffic when he saw Judy Wicker drive through the school crossing at approximately 7:45 a.m.; at this time she was headed east toward the airport. He saw her again, approximately ten minutes later, headed west. He stated that he did not see anyone in the car with Mrs. Wicker.
Officer Lang further testified that he went on routine patrol and at 9:12 a.m., he responded to a call at the home of Judy and Troy Wicker. He stated that Officer Coan arrived there at about the same time. Officer Lang testified that he found no sign of forced entry into the house. He said that when he entered the house, he found Mrs. Wicker lying on the floor and her sister, Teresa Rowland, was kneeling beside her. He stated that Mrs. Wicker was bleeding around her mouth and had scratch marks on the side of her face.
Officer Lang testified that he looked through the house and that furniture was overturned, and closets and drawers had been emptied onto the floor. He stated that he found Troy Wicker in bed, shot through the right eye.
Officer Lanny Coan was employed as a patrolman with the Muscle Shoals Police Department. He stated that he also responded to the call on February 1, 1982, at the home of Judy and Troy Wicker. He stated that upon arriving at the scene, Teresa Rowland met him outside the house and told him something was wrong with Judy Wicker. Officer Coan said that upon entering the home he found Mrs. Wicker lying on the floor and bleeding from her mouth.
Joseph Wallace was employed as a criminologist with the Alabama Department of Forensic Science in Florence, Alabama. He was called to the Wicker home to aid the police in processing the scene. He testified that he gathered various items of evidence from the home, including articles of clothing and several jars. He said he removed four spent cartridge casings from Troy Wicker's bed. He sent these casings to the Huntsville lab. He testified that he left the Wicker home and went to the parking lot of Northeast Alabama State Junior College. There he examined a maroon Buick automobile for evidence. He said that he removed hair samples from under the headrest and from the floor of the automobile. He sent these samples to the Huntsville lab.
Dr. Josefino Aguilar was employed as a forensic pathologist with the Alabama Department of Forensic Sciences. He testified that he performed a post-mortem examination on Troy Wicker on February 2, 1982, which revealed that Mr. Wicker had a *Page 655 
single gunshot wound to his right eyelid. He said that this gunshot severed Mr. Wicker's brain stem, causing his death. Dr. Aguilar removed the bullet and submitted it to Brent Wheeler, a firearms expert.
Brent Wheeler was employed as a criminologist with the Alabama Department of Forensic Sciences. He was in charge of evidence related to firearms cases, and was the director of the Huntsville lab. Mr. Wheeler testified that he examined a .22 caliber bullet which had been removed from Mr. Wicker's body, and turned over to him by Dr. Aguilar. He said that he examined four .22 caliber cartridge casings turned over to him by Joseph Wallace. He stated that the four casings were fired from the same weapon, and that these four casings were manufactured by C.C.I.. He further stated that he could not determine if the bullet removed from the victim had come from any one of the four casings he examined.
John Kilbourn was employed with the Alabama Department of Forensic Sciences and was a specialist in microscopic analysis and trace evidence analysis. He testified that he examined hair samples, sent to him by Joseph Wallace, which had been removed from a Buick automobile. He stated that the hair samples were Negroid type and that such hair had been forcibly removed.
Joel Reagan owned a mobile home business. He testified that he had known the appellant for approximately ten years. He said that when the appellant was convicted of his first murder, he promised the appellant that he would give the appellant a job if appellant was placed on work release. The appellant was placed on work release and did do work for Mr. Reagan. He testified that appellant often did not show up for work.
Mr. Reagan further testified that the appellant had introduced him to Mrs. Wicker, and that he had seen her at his place of business on at least two occasions. He said that the appellant had used his business telephone to make personal long distance calls. He testified, based on copies of his telephone bill, that the appellant had made more than one hundred sixty-seven personal long distance calls, many of which were to the Wicker home.
Deborah Tines testified that she had worked as the manager of Cher's Lounge in Huntsville, Alabama, in February of 1982. She said that she had known the appellant since December of 1981, and had seen him socially. She testified that on or about February 1, 1982, she rode towards Decatur with the appellant. She stated that when they were crossing a bridge, the appellant stopped his car and threw a bundle wrapped in a sheet over the bridge. She testified that the appellant said he was "getting rid of some old memories." (R. 1202) She testified that the appellant appeared nervous and agitated.
Ms. Tines testified that when the appellant first began coming to the lounge to see her, he always drank soft drinks, but later on he began drinking hard liquor. She further testified that in the middle of January, 1982, the appellant questioned her as to whether she ever got any "hot" guns through the lounge. She stated that she had previously told appellant on this same occasion that she carried two weapons — a .22 and a .25 caliber weapon.
Patricia Yarbrough testified that she had worked at Cher's Lounge from December, 1981, through February, 1982. She stated that she met the appellant at the lounge and he told her that he was on work release. She testified that on January 31, 1982, the appellant was in the lounge and told her he needed someone to go get some .22 long rifle C.C.I. Mini-mag bullets. She testified that she sent for her roommate, Terry Lewis, and the appellant gave her ten dollars. She said that she gave the money to Mr. Lewis and he went to purchase the bullets. She said that Mr. Lewis returned with the bullets, gave them to her, and she in turn gave them to the appellant. She further testified that the appellant told her not to worry about getting into trouble because the bullets were *Page 656 
going to be used to kill someone in Tennessee and could not be traced.
Terry Lewis testified that on January 31, 1982, he was summoned to go see Patsy Yarbrough at Cher's Lounge. He stated that when he arrived at the lounge, Ms. Yarbrough gave him a slip of paper and told him to buy some .22 caliber Mini-Mags. He testified that the bullets he purchased were manufactured by C.C.I.
Gene Moon testified that he talked with the appellant on January 31, 1982, and that the appellant asked him if he thought Patsy Yarbrough would tell she had procured bullets for appellant. He further stated that the appellant told him that he was going to make some money on the following day.
David Jones was employed as the director of the work release center in Decatur, Alabama. He testified that he was custodian of the records at the center and he brought to court records showing that on January 31, 1982, appellant signed out of the center at 9:30 a.m. and returned to the center at 6:55 p.m. Mr. Jones' records also showed that on February 1, 1982, appellant left the center at 6:00 a.m. and returned at 7:50 that night.
Mr. Jones testified that the appellant was taken off of work release because of a discrepancy between the number of hours he was away from the center and the number of hours he was actually paid for working. He stated that when the appellant was placed in the county jail, his personal belongings were inventoried and $2,000 in cash was discovered in appellant's possession.
Wanda Luther testified that she had seen the appellant at a New Year's party with Judy Wicker on December 31, 1981.
Mary Smith was the mother of Judy Wicker and Teresa Rowland. She testified that she met the appellant after Troy Wicker was killed. She testified that she heard the appellant and Judy Wicker discussing marriage.
Teresa Rowland testified that on February 1, 1982, the appellant telephoned her and asked her to pick him up so that he could meet Judy Wicker. She stated that she picked him up at the Sheffield water tower and they met Judy close to the airport. She said that while en route to meet Mrs. Wicker, the appellant told her that he loved Judy Wicker very much. She said that he then told her if she ever told anyone about his meeting Judy Wicker, he would get her or a friend of his would do so. She said that he was drinking hard liquor that morning.
Ms. Rowland testified that she left the appellant with Mrs. Wicker and drove to work. She said that she received a telephone call from Judy Wicker, while at work, and that her sister was pleading for help. She stated that she drove to the Wicker home and found Judy lying on the floor with blood on her face. She called the police but did not tell them at that time about the appellant's meeting with Judy that morning.
Pride Gann was called to testify as to the appellant's prior conviction of murder on August 16, 1977.
C.J. Cox testified that he investigated the murder of Eloise Bray West, who was the woman appellant was convicted of murdering. He testified that Mrs. West had been shot through the right eye, that the weapon was not recovered, and that the appellant had been drinking on the day of the murder.
The defense called Robert Hall, who testified that Judy Wicker had reported seeing a strange car in the neighborhood shortly before Troy Wicker was killed. He further said that he could not find any substance to Mrs. Wicker's claim.
Nancy Mathis testified that the appellant had borrowed $1,000 from her around Christmas of 1981, but she had not been repaid.
Charles Kolb testified that he was serving a sentence of life without parole and that he had a prior felony record. He stated that he had escaped from prison in Tennessee two times. He said that he was on an escape in December of 1981, and *Page 657 
went to a nightclub while he was in the Huntsville area.
On cross-examination, Mr. Kolb testified that he had talked to the appellant about the murder of Troy Wicker. He denied that he had ever talked to the prosecutor about how Troy Wicker was killed. He denied talking with the district attorney and his investigator. He denied writing a letter to the district attorney, in which he stated that he had information which would lead to the conviction of a man who killed someone in Colbert County. He further denied telling the district attorney anything about the appellant's involvement in Troy Wicker's murder.
After the defense rested, the State called Dannie Kimbrough in rebuttal. He testified that he was employed with the District Attorney's office and was so in December of 1982. He testified that he went with the district attorney to Montgomery, on December 8 and 9, 1982. He testified that they met with Charles Kolb for approximately two hours. He stated that Mr. Kolb told them that he had discussed the Troy Wicker murder with the appellant and that the appellant had described the killing to him. Kimbrough stated that Mr. Kolb said Teresa Rowland picked the appellant up and took him to the airport to meet Judy Wicker; that they went to the Wicker home, where the appellant shot Troy Wicker in the right eye as he was sleeping; and that the appellant told him Troy Wicker had beaten his wife on the night before the murder.
 I
The appellant raises a number of issues relating to the inclusion in the indictment of the charge that the appellant had previously been convicted of murder, and as a result demands reversal on these grounds.
 (A)
The appellant's first contention is that the inclusion of such a prior offense violates due process of law. Specifically, the appellant complains of § 13A-5-40 (a)(13), Code of Alabama 1975, which provides:
 "(a) The following are capital offenses: . . . (13) Murder by a defendant who has been convicted of any other murder in the 20 years preceding the crime; . . . ."
"Statutes which authorize infliction of a more severe penalty on one who is a persistent offender, do not create or define a new, separate, distinct, independent or substantive offense. Further, the statutes do not inflict additional or further punishment for the commission of the prior offense, or impose a new sentence for the prior offense, or operate in any way as punishment for the prior offense, or affect the punishment for the prior offense, or affect the punishment inflicted therefor, or serve as a basis for trying the accused again for that offense. The punishment is for the new crime only, or for only the last or latest offense committed." 24B C.J.S. Criminal Law § 1958, pp. 431-433 (citations omitted). Statutes which enhance the sentence are not violative of the due process clause, and do not create an unreasonable classification. The statute was obviously enacted with a view to the protection of society from a certain class of criminal with the belief that a hardened criminal needed more severe punishment. Graham v. WestVirginia, 224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912);Moore v. Missouri, 159 U.S. 673, 16 S.Ct. 179, 40 L.Ed. 301
(1895); McDonald v. Massachusetts, 180 U.S. 311, 21 S.Ct. 389,45 L.Ed. 542 (1901).
Furthermore, the section does not deprive the appellant of due process of law because it requires the use of a prior conviction in the indictment. Hubbard v. State, 382 So.2d 577
(Ala.Cr.App. 1979), aff'd, 382 So.2d 597 (Ala. 1980), rev'd on other grounds, 405 So.2d 695 (Ala. 1981); Wilson v. State,371 So.2d 932 (Ala.Cr.App. 1978); Williams v. State, 239 Ala. 296,195 So. 213 (1940). Moreover, the aggravating circumstances constitute an element of the capital offense and are required to be averred in the indictment, and must be proved beyond a reasonable doubt. "The aggravating circumstances must be set forth in the indictment because the State is *Page 658 
required to give the accused notice that a greater penalty is sought to be inflicted than for a first offense." Wilson v.State, supra; Hubbard v. State, supra; Beck v. State,396 So.2d 645 (Ala. 1980); Bracewell v. State, 407 So.2d 827 (Ala.Cr.App. 1979), rev'd on other grounds, 407 So.2d 853 (Ala. 1981).
Additionally, the trial court instructed the jury on the effect of such evidence (R. 1743):
 ". . . Now ladies and gentlemen of the jury, the indictment that I read to you is not evidence in this case. It is not to be considered evidence in this case. It is merely the vehicle by which a charge against a defendant is brought into court for your consideration. . . ."
Consequently, we find no denial of due process by the use of the prior conviction.
 (B)
The appellant argues that the charge of a prior murder unfairly prejudices the jury against him. As was noted above, the jury was instructed more than once that the charge in the indictment was not evidence in this case. The prior conviction is an element of the offense and must be averred to in the indictment and proved at trial. We do not find that the charge unfairly prejudiced the jury against this appellant.
The appellant's further arguments against the inclusion of the prior conviction in the indictment are without merit.
 II
The appellant argues that the trial court erred in allowing the State to ask certain questions on voir dire, concerning whether the veniremen could impose the death penalty.
The question the appellant complains of may be broken down into two categories: (a) can you vote for the death penalty if the facts in this case justify it?, and (b) could or would you vote for the death penalty in the case of a murder committed by a defendant who has committed another murder within the previous twenty years? This court has held on numerous occasions that in the exercise of its peremptory strikes, either party has the right, within the trial court's discretion, to examine jurors on any matter which might tend to affect their verdict. Dyer v. State, 241 Ala. 679, 4 So.2d 311
(1941); Sanders v. Scarvey, 284 Ala. 215, 224 So.2d 247 (1969);Ex Parte Ledbetter, 404 So.2d 731 (Ala. 1981). However, soliciting promises to return a certain verdict are prohibited.Ex Parte Dobard, 435 So.2d 1351 (Ala. 1983). In this case, the questions asked of the members of the venire were for the purpose of obtaining information which may affect their verdict, and in no way could they be interpreted as soliciting a promise from the prospective jurors. Moreover, "questions concerning jurors' attitudes about capital punishment are not limited to those questions which would elicit information which would constitute grounds of a challenge for cause." Brown v.State, 264 So.2d 553 (Ala. 1972). Furthermore, the matter of how the voir dire of the jury venire is conducted is within the discretion of the trial court. Gilliland v. State, 291 Ala. 89,277 So.2d 901 (1973); Witherspoon v. State, 356 So.2d 743
(Ala.Cr.App. 1978), and cases cited therein. There was no abuse of discretion in this case.
 III
The appellant contends that the trial court erred in denying his motion for a change of venue due to extensive pretrial publicity.
One of the fundamental tenets embodied in the United States Constitution is the right to a jury trial. "This right guarantees that an accused shall receive a fair trial by a panel of impartial jurors." Irvin v. Dowd, 366 U.S. 717,81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Section 15-2-20, Code of Alabama 1975 states that a defendant is entitled to a change of venue to another county if he can show to the reasonable satisfaction of the trial court that a fair and impartial trial cannot be had in the county in which the indictment is found. *Page 659 Anderson v. State, 362 So.2d 1296 (Ala.Cr.App. 1978); Hopkinsv. State, 429 So.2d 1146 (Ala.Cr.App. 1983); Nelson v. State,440 So.2d 1130 (Ala.Cr.App. 1983).
The appellant had the burden of proving that he could not receive an impartial trial and an unbiased verdict in Colbert County. Moulds v. State, 426 So.2d 942 (Ala.Cr.App. 1982);Magwood v. State, 426 So.2d 929 (Ala. 1983), and cases cited therein; Hopkins, supra. The trial judge heard all the evidence and the arguments with reference to this change of venue motion, and determined that the climate was not one of inherent prejudice against this appellant and that a fair and impartial trial could be provided in Colbert County. This determination of whether to grant or deny a change of venue is a matter left to the sound discretion of the trial court. Turner v. State,410 So.2d 458 (Ala.Cr.App. 1981); Botsford v. State,54 Ala. App. 482, 309 So.2d 835 (Ala. 1974); Nelson v. State,440 So.2d 1130 (Ala.Cr.App. 1983). This is generally the law because the trial judge is in the best position to weigh any prejudicial publicity against the accused and any prejudicial feeling against the accused in the community. Botsford, supra; Burnettv. State, 350 So.2d 718 (Ala.Cr.App. 1977); Nelson, supra.
In the absence of such "inherently prejudicial publicity," a showing of "actual prejudice directed toward the accused resulting from the extensive publicity" must be shown.Anderson, supra, and cases cited therein. The usual method provided for showing actual jury prejudice to support a change of venue motion is an extensive and thorough voir dire examination of prospective jurors. Anderson, supra. This procedure was followed in the instant case.
Based on this extensive voir dire testimony, which encompassed nearly 1,000 pages of the transcript, the trial court denied appellant's motion for a change of venue. Absent a clear showing of abuse of discretion, such a venue determination by a trial court will not be disturbed on appeal.Magwood, supra; Botsford, supra; Lopez v. State, 415 So.2d 1204
(Ala.Cr.App. 1982); Nelson v. State, 440 So.2d 1130
(Ala.Cr.App. 1983). There was no abuse of discretion in this case, and, therefore, no error by the trial court. Under the circumstances, we are convinced that the appellant received a fair trial in Colbert County.
 IV
The appellant contends that the trial court erred in denying his challenges for cause on certain prospective jurors. A thorough review of the entire record reveals that the trial court did not err in denying the challenges. Each juror was extensively examined on voir dire and each testified in substance that they could render a fair and impartial verdict. "Where jurors testify that they have an opinion, but that they will try the case fairly and impartially according to the law and evidence and that their opinion will not influence their verdict, they are competent to serve as jurors, and it is not error for the trial court to deny challenge for cause." Godauv. State, 179 Ala. 27, 60 So. 908 (1913); McCorvey v. State,339 So.2d 1053 (Ala.Cr.App.), cert. denied, 339 So.2d 1058
(Ala. 1976); Jarrell v. State, 355 So.2d 747 (Ala.Cr.App. 1978).
The appellant challenged for cause four prospective jurors and the trial court denied the challenges. This decision was in the sound discretion of the trial judge. Glenn v. State,395 So.2d 102 (Ala.Cr.App. 1980), cert. denied, 395 So.2d 110 (Ala. 1981); Stewart v. State, 405 So.2d 402 (Ala.Cr.App. 1981), and cases cited therein. The trial court did not abuse this discretion, and, therefore, no error has been committed.
 V
The appellant contends that the trial court erred in admitting photographs of the murder victim and further argues that the pictures had no probative value, other than to inflame the jury. *Page 660 
At trial, appellant objected to the introduction of three photographs depicting the wound on the body of the victim. He claims that the pictures were inflammatory, gruesome, gory, and had no probative value. As a general rule, photographs are admissible in evidence if they tend to "prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, to corroborate or disprove some other evidence offered or to be offered," and their admission is within the sound discretion of the trial judge.Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Thigpenv. State, 50 Ala. App. 176, 277 So.2d 922 (1973); Hopkins v.State, 429 So.2d 1146 (Ala.Cr.App. 1983). Photographs may be admitted if they tend to shed light on, strengthen, or to illustrate other testimony in the case. Chunn v. State,339 So.2d 1100 (Ala.Cr.App. 1976); Thornton v. State, 369 So.2d 63
(Ala.Cr.App. 1979). In addition, photographs are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome. Craft v. State, 402 So.2d 1135 (Ala.Cr.App. 1981); McKee v. State, 33 Ala. App. 171, 31 So.2d 656 (1947);Godbolt v. State, 429 So.2d 1131 (Ala.Cr.App. 1982).
The photographs introduced here revealed the location of the gunshot wound, a relevant, material fact and corroborate other evidence offered at trial. The trial court in this case has not abused his discretion in admitting these photographs into evidence.
 VI
The appellant contends that the trial court erred in allowing evidence of his prior conviction of murder.
 (A)
The State called Pride Gann to prove that the appellant had a prior conviction of murder within the last 20 years, a fact alleged in the indictment and the basis of the capital murder charge against the appellant. Mr. Gann testified that he was the Circuit Clerk of Marion County, Alabama, and that he had been serving in such capacity for the past 24 years. He produced a properly certified copy of the minute entry showing that the appellant had been previously convicted of second degree murder in Marion County, Alabama, on August 16, 1977.
It is well settled in Alabama that "when there is an allegation as to a former conviction in an indictment, this former conviction becomes an issue, and evidence of it at trial is necessary for the indictment to have operation." Funches v.State, 56 Ala. App. 22, 318 So.2d 762, cert. denied, 294 Ala. 757, 318 So.2d 768 (1975); Thigpen v. State, 355 So.2d 392
(Ala.Cr.App.), affirmed, 355 So.2d 400 (Ala. 1977); Julius v.State, 407 So.2d 141 (Ala.Cr.App. 1980), rev'd on other grounds, 407 So.2d 152 (Ala. 1981). Since such an allegation was in the indictment, a certified copy of the judgment is competent and admissible to prove this issue. Williams v.State, 130 Ala. 31, 30 So. 336 (1901); Yates v. State, 245 Ala. 490, 17 So.2d 777 (1944); Thigpen, supra; Julius, supra.
In view of the foregoing authority, the trial court was not in error for allowing such evidence of appellant's prior conviction into evidence.
 (B)
The appellant further argues that the trial court committed error in admitting the details of the appellant's prior killing into evidence.
"While it is generally true that evidence of separate crimes is inadmissible where the only probative function of such evidence is to show bad character, or an inclination or propensity to commit the type of crime for which an accused is being tried, if the accused's commission of another crime or misdeed is an element of guilt, or otherwise tends to prove his guilt, then proof of such other crimes is admissible." Sparksv. State, 376 So.2d 834 (Ala.Cr.App. 1979); Watson v. State,398 So.2d 320 (Ala.Cr.App. 1980); Cheatham v. State, *Page 661 431 So.2d 1350 (Ala.Cr.App.), cert. denied, 431 So.2d 1350 (Ala. 1983). Therefore, evidence of other crimes committed by an accused is not admissible as substantive evidence to prove the accused's guilt of the particular offense for which he is on trial. Allen v. State, 380 So.2d 313 (Ala.Cr.App. 1979), cert. denied, 380 So.2d 341 (Ala. 1980), cert. denied, 449 U.S. 842,101 S.Ct. 121, 66 L.Ed.2d 49 (1980); Wilkens v. State,29 Ala. App. 349, 197 So. 75 (1940). However, if evidence of other collateral crimes which were committed by an accused tends to point to the guilt of the accused as to the offense upon which he is being tried, then the evidence is relevant and competent and it should be admitted regardless of its incidental effect.Allen, supra; Wilkens, supra.
Moreover, under the identity exception to the general exclusionary rule prohibiting the admission of other or collateral crimes as substantive evidence of the guilt of the accused, the prior crime is not relevant to prove identity unless both that and the now-charged crime are "signiture crimes" having the accused's mark and the peculiarly distinctive modus operandi so that they may be said to be the work of the same person. Thomas v. State, 409 So.2d 955
(Ala.Cr.App. 1981). The collateral and current offenses must, unless they bear such a close resemblance to each other that they can be assumed to derive from the same plan or planner, have been committed in the same novel or peculiar manner.Thomas v. State, supra; C. Gamble, McElroy's Alabama Evidence, § 69.01 (8) (3rd ed. 1977).
The Alabama courts have noticed the defendant's novel or peculiar modus operandi in several recent cases. See Breen v.State, 349 So.2d 113 (Ala.Cr.App. 1977); Smith v. State,409 So.2d 455 (Ala.Cr.App. 1981); Nichols v. State, 422 So.2d 804
(Ala.Cr.App. 1982); Brewer v. State, 440 So.2d 1155
(Ala.Cr.App. 1983), and cases cited therein.
In the present case, the victim of the prior crime was executed with a single pistol shot through the right eye, as was the victim in the present murder. In both instances, the appellant had been drinking. Furthermore, the murder weapon was disposed of and never found in both cases. The use of such a bizarre method of killing his victims is the essence of the signiture crime. When compared to the foregoing Alabama cases, the circumstances surrounding the two offenses, do present sufficient evidence of plan, design, scheme, identity, and modus operandi to justify admissibility of the details through the testimony of one C.J. Cox. (R. 1440)
 VII
The appellant contends that the State was improperly allowed to impeach the testimony of one Charles Kolb, III and for this reason the cause should be reversed. The appellant argues that no relevant or useful information was elicited from Mr. Kolb and, therefore, the State could not go into other relevant matters with the witness.
The right to wide ranging cross-examination, as well as a thorough and sifting cross-examination, belongs to everyone. §12-21-137, Code of Alabama 1975; Ball v. State, 337 So.2d 31
(Ala.Cr.App.), cert. denied, 337 So.2d 39 (Ala. 1976);Bickerstaff v. State, 369 So.2d 315 (Ala.Cr.App. 1979); Trawickv. State, 431 So.2d 574 (Ala.Cr.App. 1983). "Cross-examination is not limited to matters brought out on direct examination, but extends to all matters within the issues of the case."Trawick, supra. Furthermore, the range and extent of the cross-examination of a witness is a matter within the sound discretion of the trial court, and such decision will not be reversed upon appeal unless a clear abuse of discretion exists.Malone v. State, 358 So.2d 490 (Ala.Cr.App. 1978); Renfroe v.State, 382 So.2d 627 (Ala.Cr.App.), cert. denied, 382 So.2d 632
(Ala. 1980); Weaver v. State, 407 So.2d 568 (Ala.Cr.App. 1981).
"A party on cross-examination may interrogate the witness as to any matter relevant to the issues in the case without vouching for his credibility or forfeiting his right to assail or impeach him as the witness *Page 662 
of his adversary." This is true even though the matter elicited on cross-examination was not touched on in direct examination.Carter v. State, 191 Ala. 3, 67 So. 981 (1915); Shields v.State, 52 Ala. App. 690, 296 So.2d 786 (1974); C. Gamble,McElroy's Alabama Evidence, § 171.01 (5) (3rd ed. 1977).
In this instance, the State properly impeached Mr. Kolb's testimony. They laid the proper foundation for impeachment by asking him whether he made specific statements, specifying the time when, the place where, the person to whom such statements were made, and the substance of the statements. (R. 1571-1588). After the proper predicate has been laid, then the State is allowed to elicit extrinsic evidence from another witness to rebut the prior testimony. C. Gamble, McElroy's AlabamaEvidence, § 157.01 (1) (3rd ed. 1977); Thigpen v. State,355 So.2d 392 (Ala.Cr.App.), aff'd, 355 So.2d 400 (Ala. 1977);Arnold v. State, 339 So.2d 616 (Ala.Cr.App. 1976); Bythewood v.State, 373 So.2d 1170 (Ala.Cr.App.), cert. denied,373 So.2d 1175 (Ala. 1979).
The trial court was not in error for allowing this impeachment of Charles Kolb.
 VIII
As required by § 13A-5-53 (a), Code of Alabama 1975, this court must review the propriety of the imposition of the death penalty in this case. Our review must include a determination of the following questions:
 (1) Was any error adversely affecting the rights of the defendant made in the sentence proceedings?
 (2) Were the trial court's findings concerning the aggravating and mitigating circumstances supported by the evidence?
(3) Was death the proper sentence in this case?
As to the first question, we have reviewed the sentence proceedings and have found no error adversely affecting the defendant's rights. We are also satisfied that the trial court's written findings concerning the aggravating and mitigating circumstances are fully supported by the evidence.
To answer the question of whether the death penalty was properly imposed in this case, we must determine:
 (1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
 (2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
 (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
Alabama Code § 13A-5-53 (b) (1975); see also Beck v. State,396 So.2d 645 (Ala. 1981).
There is nothing in the record before us which even intimates that the death penalty was imposed under the influence of passion, prejudice, or any other arbitrary factor.[1]
Our independent weighing of the aggravating and mitigating circumstances leaves us with no doubt that the death penalty was appropriate in this case. The mitigating circumstances did not outweigh the aggravating circumstances. However, there were two aggravating circumstances: (1) the defendant committed this crime while under a sentence of imprisonment, § 13A-5-49 (1), Code of Alabama 1975; and (2) the defendant was previously convicted of a felony involving the use of violence to the person, § 13A-5-49 (2), Code of Alabama 1975.
In regard to the final determination this court must make, we find that the death penalty imposed on the defendant is not *Page 663 
excessive or disproportionate to the penalty imposed in similar cases. See e.g., Patricia Ann Thomas Jackson v. State,459 So.2d 963 (Ala.Cr.App. 1984); Arthur James Julius v. State,455 So.2d 975 (Ala.Cr.App. 1983); Thigpen v. State, 355 So.2d 392
(Ala.Cr.App.), affirmed, 355 So.2d 400 (Ala. 1977).
We have searched the record as required by Rule 45A, A.R.A.P., and have found no error which adversely affected the rights of the defendant. The sentence of death was proper in this case. Therefore, the judgment of the trial court is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur.
[1] The trial court's order and judgment at the sentencing hearing is hereto attached as Appendix A (R. 1849-1855).
 APPENDIX A But as for fair punishment for what he has done, there is only one penalty and that is the death penalty. And we ask for it and we beg for it. Thank you.
BY THE COURT: Anything else?
MR. MAYS: No, Your Honor.
BY THE COURT: Do you have anything to say why sentence should not be imposed at this time by the Court?
MR. ARTHUR: Judge, all I can say is what I've said. Please let me continue to do what I can do, because I can't get out of prison if you give life with no parole, but if my life is gone, I can't do anything. If my life is taken, there's no way it can last as long as if I'm allowed to continue to try to do some good. That's all I can say. Thank you.
BY THE COURT: Thank you. As you know, under the Code of the State of Alabama in 13A-5-47, the Court is required to enter written findings. And at this time, we are going to recess until four o'clock, during which time I will prepare an order. We will be in recess until that time.
(Following the recess, court proceedings resumed)
BY THE COURT: Are you ready?
MR. MAYS: Yes, Your Honor.
BY THE COURT: Before I read the sentence of the Court, if there is anyone in the courtroom that might get upset or emotional or anything like that, I will ask you to leave at this time. The Court won't tolerate any disturbance in the court, and I've asked the deputies to remove any person that does cause any disturbance. Let me just say that the Court has considered this case, not only today, but for several days, during the trial and after the jury verdict and has thought about it a lot, not only today, and I have made a — prepared an order this afternoon and I will read it, and I will give it to the attorneys; I have copies made. The record reflects that Mr. Arthur was found guilty of capital murder of Troy Wicker and the jury recommended death in this case. The Court by law in accordance with Section 13A-5-47 of the 1975 Code of Alabama must report its findings in writing. In the matter of the State of Alabama vs. Thomas Douglas Arthur, the Court held a hearing on this the 21st day of March, 1983, to determine whether or not the defendant would be sentenced to death in accordance with the advisory verdict of the jury or to be sentenced to life imprisonment without parole. The defendant was present in open court with his attorneys, John Mays and Wesley Lavender. The State was represented by James A. Patton, the District Attorney. Under Section 13A-5-47 of the 1975 Code of Alabama, this Court is under an obligation to make written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in 13A-5-49 of the 1975 Code of Alabama, and each mitigating circumstance enumerated in Section 13A-5-51
of the 1975 Code of Alabama, and any additional mitigating circumstances offered pursuant to Section 13A-5-52 of the 1975 Code of Alabama. Also, the Court is obligated to make written findings of facts summarizing the crime and the defendant's *Page 664 
participation in it. The trial in this case was completed on the 19th day of February, 1983, with the jury verdict of guilty, and the recommended punishment fixed at death. The testimony and evidence at trial is still fresh in the mind of this Court. The Court is cognizant of the exhibits and testimony offered and entered at trial. The Court finds from all of the evidence and the jury verdict that the defendant is guilty of the murder of Troy Wicker, after the defendant had been convicted of murder of Eloise Bray West in the second degree on the 16th day of August, 1977, for which the defendant, Thomas Douglas Arthur, was sentenced to life in the penitentiary. The Court further finds that the evidence shows on the morning of the first day of February, 1982, prior to and shortly before the killing of Troy Wicker, a person by the name of Teresa Rowland, the sister of Judy Wicker, picked up the defendant, Thomas Douglas Arthur, at what is known as the standpipe in the City of Sheffield, Colbert County, Alabama, and drove him to or near the Muscle Shoals Airport, at which time said defendant got into the car with Judy Wicker. Judy Wicker has been previously convicted of the murder of Troy Wicker. Shortly thereafter, Judy Wicker and the defendant, Thomas Douglas Arthur, entered the home of the victim, Troy Wicker, in Muscle Shoals, Colbert County, Alabama, at the address of 301 Highland Avenue. The Court further finds from the evidence that on said occasion, the defendant, Thomas Douglas Arthur, caused the death of Troy Wicker. And the said Troy Wicker was found dead in his bed, having been shot through the right eye, causing his death. The Court further finds from the evidence introduced at the trial that this capital felony was committed after the defendant, Thomas Douglas Arthur, had been convicted of the murder of Eloise Bray West in the second degree on the 16th day of August, 1977, and he was sentenced to life in the penitentiary. The Court further finds that the defendant was previously convicted of another felony as aforesaid involving the use of violence to the person of Eloise Bray West, who was shot in the right eye, causing her death. The Court further finds that the recommendation of the sentence of death by the jury was not imposed under the influence of passion, prejudice or any other arbitrary factors. The Court further finds that the defendant has been furnished a pre-sentence investigation report which contains certain information such as statements made by Judy Wicker and her mother, Mary Smith, which were not admissible in this case, as Judy Wicker did not testify in this case. And the Court is not considering this part of the pre-sentence report in the determination of the sentence in this case. The Court further finds the defendant has been afforded the opportunity to rebut any and all hearsay evidence introduced in this hearing. The Court has affored the defendant the opportunity to offer evidence of mitigating circumstances. The Court finds that there are no mitigating circumstances as enumerated in Section 13A-5-51 of the 1975 Code of Alabama, and the Court finds that the defendant testified in the sentence hearing today, and offered additional mitigating circumstances pursuant to Section 13A-5-52 of the 1975 Code of Alabama. The defense offered Exhibits 1 through 12 to be considered in its offer of additional mitigating circumstances. The Court has considered all the circumstances in this case, and finds that the aggravating circumstances enumerated above to be present and outweigh the mitigating circumstances offered by the defendant in this case, pursuant to Section 13A-5-52
of the 1975 Code of Alabama. The Court finds no reason whatsoever to change the punishment as recommended by the jury verdict at death. And now, on this the 21st day of March, 1983, the defendant, Thomas *Page 665 
Douglas Arthur, being present in open court, and having been convicted by a jury of capital murder, and his punishment recommended by said jury at death; the said defendant, Thomas Douglas Arthur, being asked by the Court if he had anything to say why the judgment of the Court and sentence of the law should not now be pronounced against him, wherein the Court stated, "Do you have anything to say why sentence should not be imposed at this time by the Court?" To which the defendant, Thomas Douglas Arthur, replied, "Judge, all I can say is what I have said. Please let me continue to do what I can do, because I can't get out of prison if you give me life with no parole, but if my life is gone, I can't do anything. If my life is taken, there's no way it can last as long as if I'm allowed to continue to try to do some good. That's all I can say. Thank you." It is therefore considered by the Court and it is the judgment of the Court that the defendant, Thomas Douglas Arthur, is guilty of capital murder in accordance with the verdict of the jury in this case, and it is the judgment of this Court, in accordance with the recommendation of death by the jury and the sentence of the law that the said Thomas Douglas Arthur suffer death by electrocution on the 21st day of July, 1983, and the Sheriff of Colbert County, Alabama, is directed to deliver said defendant, Thomas Douglas Arthur, to the custody of the Director of the Department of Corrections and Institutions in Montgomery, Alabama, and the designated executioner shall, at the proper place for the execution for one sentenced to suffer death by electrocution, cause a current of electricity of sufficient intensity to cause death in the application and continuance of such current to pass through the said Thomas Douglas Arthur until the said Thomas Douglas Arthur is dead. May God have mercy on you. Signed this date, by me. This judgment of the Court is automatically reviewed. You have the right to appeal it and if you can't afford a lawyer to represent you, the Court will appoint one for you free of charge. If you cannot afford a transcript, the Court will provide one to you free of charge. And the attorneys have filed a motion for determination of indigency and motion for a free transcript. Do the attorneys have anything to say on this motion?
MR. MAYS: I think it speaks for itself, Your Honor.
BY THE COURT: All right, anything from the State?
MR. PATTON: The two thousand dollars has been forfeited to the welfare fund. We are not going to argue against it.
BY THE COURT: All right, your motion is granted. And Mr. Lavender and Mr. Mays, you are appointed to represent Mr. Arthur on appeal. And the Court further orders that a transcript be prepared, and furnished to you.
MR. MAYS: Your Honor, at this time, the defendant gives formal notice of appeal.
BY THE COURT: Okay, anything else?
MR. MAYS: No, sir.
MR. PATTON: No, sir.
BY THE COURT: Court is adjourned.